2024 IL App (1st) 240532-U

SECOND DIVISION
November 26, 2024

**THIS APPEAL INVOLVES A MATTER SUBJECT TO EXPEDITED DISPOSITION
UNDER RULE 311(A)**

Nos. 1-24-0532 and 1-24-1152, Consolidated

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* E.O. and L.B., | ) | Appeal from the |
| Minors | ) | Circuit Court of |
| | ) | Cook County. |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 17 JA 552 and |
| | ) | 17 JA 550 |
| | ) | |
| K.O., | ) | Honorable |
| | ) | Lisa M. Taylor, |
| Respondent-Appellant). | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

ORDER

¶ 1    *Held*:   We affirm the judgment of the circuit court of Cook County terminating the mother's parental rights; the trial court did not violate the mother's right to due process by commencing trial in the mother's absence where the mother was represented by counsel; the mother forfeited her claim the trial court should make detailed factual findings in support of its judgment.

¶ 2    K.O. is the mother of L.B. and E.O. The State sought to terminate K.O.'s parental rights to L.B. and E.O. Following a bifurcated termination trial, the circuit court of Cook County first

found K.O. unfit, then found that it was in the children's best interest to terminate K.O.'s parental rights. For the following reasons, we affirm.

¶ 3                                BACKGROUND

¶ 4      In light of the nature and scope of the issues raised on appeal, we provide a limited summation of the proceedings leading to this appeal only to the extent necessary to understand the issues and our resolution of them. On June 13, 2017, the State filed separate petitions for adjudication of wardship of L.B., "a female minor bon on August 27, 2011," and E.O., "a male minor born on April 16, 2013." The petitions listed K.O. as the minors' mother. The petition as to E.O. listed the name of E.O.'s father with address unknown. The name of L.B.'s father was unknown. Neither father is a party to this appeal.

¶ 5      The Petition for Adjudication of Wardship of L.B. alleged that L.B. was a neglected minor whose environment is injurious to her welfare pursuant to section 2-3(1)(b) of the Juvenile Court Act (Act) (705 ILCS 405/2-3(1)(b) (West 2016)) and abused pursuant to section 2-3(2)(i) of the Act (705 ILCS 405/2-3(2)(i) (West 2016)) in that her parent inflcts, caused to be inflicted, or allows to be inflicted upon her physical injury by other than accidental means. L.B.'s petition states that L.B. and her sibling were observed to have physical injuries likely to be the result of physical abuse.

¶ 6      The Petition for Adjudication of Wardship of E.O. alleged that E.O. was a neglected minor whose environment is injurious to his welfare pursuant to section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2016)) and abused pursuant to section 2-3(2)(ii) of the Act (705 ILCS 405/2-3(2)(ii) (West 2016)) in that his parent creates a substantial risk of physical injury to him by other than accidental means. E.O.'s petition states that two of his siblings were observed to

have injuries "likely to be the result of physical abuse." (L.B. and E.O. have three younger siblings.)

¶ 7    On May 17, 2018, the trial court entered an Adjudication Order finding L.B. abused or neglected under the Act due to an injurious environment, physical abuse, and a substantial risk of physical injury. The order also found that L.B. was physically abused by her mother. The same day, the trial court entered an Adjudication Order finding E.O. abused or neglected due to a substantial risk of physical injury. The order found that E.O's sibling was physically abused by her mother.

¶ 8    On July 13, 2018 the court entered two Disposition Orders adjudging L.B. and E.O. wards of the court and finding that K.O. is unable to care for, protect, train, or discipline the minors.

¶ 9    On October 18, 2018, the trial court entered Permanency Orders as to both minors. The orders found that the appropriate permanency goal for both minors was return home within 12 months. The orders found that K.O. was engaged in services and had made some progress towards the return home of the minors. In subsequent Permanency Orders on May 1, and December 19, 2019, and December 7, 2020, the goal remained return home. The Permanency Order for L.B. and E.O. on December 19, 2019 found that K.O. had made substantial progress toward the return home of both minors, was engaged in services, and was consistently visiting with the minors. But on December 7, 2020 the permanency order found that K.O. had not made substantial progress toward the return home of L.B. or E.O., needed to engage in current services and engage in additional recommended services, and that an evaluation was needed to address K.O.'s progress in services. On May 21, 2021, the permanency goal for both minors changed to

substitute care pending termination of parental rights. The orders noted that services were ongoing.

¶ 10     On February 3, 2023 the State filed a Supplemental Petition for the Appointment of Guardian With The Right to Consent to Adoption for L.B. and E.O. The petitions alleged that K.O. was unfit pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)) and 2-29 of the Juvenile Court Act (705 ILCS 405/2-29 (West 2022)) in that K.O. (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare (ground b), (2) deserted the minors for more than the three months next preceding the commencement of termination proceedings, (3) failed to make reasonable efforts to correct the conditions which were the basis for the removal of the children from K.O. (ground (m)(i)) and/or failed to make reasonable progress toward the return of the children to K.O. within 9 months after the adjudication of neglect or abuse and/or within any nine month period after the finding of neglect or abuse (ground (m)(ii)), and (4) evidenced intent to forego parental rights. The petition for L.B. stated that L.B. was in need of residential treatment and that the Department of Children and Family Services (DCFS) would be searching for a pre-adoptive placement when L.B. was ready to be placed in a foster home. The petition for E.O. stated that E.O. was currently not placed in a pre-adoptive home but DCFS was actively searching for a pre-adoptive home for E.O. On November 2, 2023, the State filed a joint pleading pursuant to sections 50/1(D)(m)(iii) of the Adoption Act (750 ILCS 50/1(D)(m) (West 2022)) and section 2-29 of the Juvenile Court Act (705 ILCS 405/2-29 (West 2022)) as to L.B. and E.O. alleging unfitness for failing to make

reasonable progress toward the return of the children during any 9-month period between July 1, 2018 and October 1, 2023.[1]

¶ 11    On January 11, 2024, the trial court held a termination trial. After the attorneys placed their appearances on the record but before proceedings began, the following exchange between the trial court and K.O.'s attorney from the Office of the Public Defender occurred:

"THE COURT: Ms. Hussain, do you anticipate your client?

MS. HUSSAIN [Assistant Public Defender]: She was subpoenaed, pursuant to her request, so I would expect her to appear at some point.

THE COURT: Okay. So just so the record is clear, it is 9:34 a.m. and [K.O.] is not present in court."

¶ 12    The trial court then addressed the attorneys for all of the parties about a motion filed by the Assistant Public Guardian. After their conversation the court decided "to table the issues related to the motion" and "to proceed with our termination trial." The first witness for the State, Brenda Burziaga, was already on the witness stand. The attorney for L.B.'s father (who later appeared) and K.O.'s attorney gave an opening statement. The court confirmed which allegations of unfitness the State was proceeding on as to the father, and as to K.O. (grounds "b" and "m"), the court addressed "one other housekeeping matter" and confirmed that the State had filed "seven nine-month periods for purposes of Section m under the Adoption Act." Ms. Burziaga proceeded to testify. The court did not note the time. K.O.'s attorney did not object.

---

[1]    "[W]hen a petition or motion seeks to terminate parental rights on the basis of item (ii) of this subsection (m) [(unfitness due to failure to make reasonable progress toward the return of the child)] the petitioner shall file with the court and serve on the parties a pleading that specifies the 9-month period or periods relied on." 750 ILCS 50/1(D)(m) (West 2022).

¶ 13    Burziaga testified, in pertinent part to this appeal, that she was the caseworker on this case from October 2020 until August 2021. Burziaga reviewed the information from the file for this case up until August 2021. When Burziaga became the caseworker K.O. had completed some services but still had to complete individual therapy and psychiatry services. The services K.O. had successfully completed were domestic violence services and parenting classes. It was recommended that K.O. continue with psychiatry services. K.O. needed to continue with therapy because her therapist thought that K.O. needed to improve in her anger, relationships with others, and expressing her feelings. The family never progressed to family therapy. While Burziaga was the caseworker L.B. was in a residential facility and K.O. had supervised visits. During the visits Burziaga observed, K.O. had difficulty focusing on the visit itself rather than complaining about things. Burziaga testified that K.O. commented on the children's clothing and yelled at them causing the children to cry; but K.O. did not change her tone and just continued to blame "everyone about everything." Unsupervised visits were never recommended and Burziaga thought they would be unsafe. K.O. never improved during the visits. Burziaga testified that K.O. was always upset when communicating with Burziaga and yelled and cursed at her. K.O. also threatened Burziaga. Burziaga's agency recommended a goal of substitute care pending termination of parental rights because "the minors had been in the—were in the system for a long time, couple years, and the progress that mom was doing or having was minimum progress."

¶ 14    After the attorneys for the minors (the Assistant Public Guardian), L.B.'s father, and K.O. cross-examined Burziaga, and redirect examination by the State, the court went "off the record for one moment." The court did not note the time. When proceedings on the record resumed, the State began its direct examination of Marielena Nieto.

¶ 15     Nieto testified, in pertinent part to this appeal, that she was the caseworker for this family from September 2022 until August 2023. When Nieto took over the permanency goal was no longer return home. At that time K.O. was still receiving psychiatric services, and individual therapy and re-enrollment in parenting classes was recommended. K.O. initially would not provide information about providers and, after she did, would not sign release forms, so that Nieto could receive reports from K.O.'s therapist. When Nieto left the case K.O. was not receiving psychiatric services because K.O. was waiting to be assigned a new psychiatrist. Nieto could not determine if K.O. had progressed to the point that the family could begin family therapy because K.O. did not sign a release of information from her therapist. Nieto's agency also recommended additional parenting courses after two incidents during visits. K.O. did not reengage in parenting courses because, K.O. told Nieto, she had "already done that and she wasn't going to do any extra work." Nieto supervised visits between K.O. and her children. Nieto had to redirect K.O. to focus on the children instead of putting blame on the agency. Nieto terminated a visit with L.B. because K.O. got into an altercation with L.B. in front of the other children. Nieto had to physically separate K.O. and L.B. and ask K.O. to leave. L.B. stated that "at that moment" she did not want further visits with K.O. The agency did not recommend visits with L.B. because they would be clinically inappropriate.

¶ 16     Nieto testified that at a subsequent visit (without L.B.) K.O. had a verbal altercation with another sibling and started saying things about the foster parents. Nieto attempted to redirect K.O. from that subject but was not successful. The visit had to be ended a few minutes early. Nieto testified that E.O. was "in shock" at what happened. The agency halted visits until a full "staffing" after which it was determined that visitation with E.O. should resume virtually and, if they went well, progress to in-person visitation. During those visits K.O. had to be redirected

from inquiring about E.O.'s whereabouts with his foster parents. K.O. did listen to the redirections. The agency never recommended unsupervised visits with either child due to K.O. not completing services and because of the incidents during the visits. When Nieto left the case the agency's recommendation was for virtual visits with E.O. and no visits with L.B. L.B. continued to state that she did not want to visit with K.O. because K.O. made her unstable and, Nieto testified, L.B. "preferred her stability over visits with mom."

¶ 17    At the conclusion of Nieto's direct examination, the trial court went "off the record for just a moment." When proceedings on the record resumed, the trial court stated as follows:

> "THE COURT: We were in the middle of Ms. Nieto's testimony. Before we do that, I do want the record to reflect that mom has joined us. She indicated to the Court that she had been present since 9:00 a.m. So I'm going to say I apologize that you were not brought in sooner."

The court did not note the current time.

¶ 18    The attorney for L.B.'s father conducted a cross-examination, followed by a redirect and recross, and Nieto's questioning concluded. Amelia Najera was the next witness to testify. Najera testified, in sum, that she had been assigned to this family since November 2023. K.O. had multiple outstanding services but was not participating in services. K.O. was hostile toward Najera and the agency, and their communication was not productive. Najera did testify that a December 2023 visit with E.O. went well. However, E.O. told Najera he did not want his mother to know where he was placed for his own safety and for the safety of his foster parents.

¶ 19    Next, Zandra Washington testified she is a supervisor at the agency servicing K.O. and she supervised K.O.'s case since 2021. K.O. has consistently been hostile with Washington and the hostility worsened over time. K.O. threatened Washington. Washington testified that K.O.

still had to complete individual therapy, parent coaching, family therapy, and psychiatric services including medication. K.O. had virtual visits with E.O., and virtual visits with L.B. resumed in December 2022, at L.B.'s request. Washington testified the virtual visits with L.B. went well. K.O. had to be redirected to focus on L.B., and K.O. did follow the redirection and continued to bond with L.B.

¶ 20      K.O. testified on her own behalf. K.O. testified she completed multiple services in 2017 (domestic violence, anger management, and nurturing parent). She testified she completed parent coaching in 2017 and again in 2021. K.O. was in psychotherapy from 2017 until 2019 and received psychiatric services in 2014 and resumed in 2017. K.O. testified she completed all of her services in 2020. K.O. worked on "emotional dysregulation, trying to learn how to be aware of triggers, [and] how to understand other peoples and thoughts" with her therapist. K.O. testified that family therapy was never provided. K.O. testified she completed Bright Star where she learned "effective communication" and "safety for children." K.O. admitted she has "a really hard time with emotion regulation" but was learning "how to be a better parent because kids do change throughout time with a different age for every situation." K.O. informed the trial court "that I love my kids and it's very hard that I haven't been able to have successful visits with them because my visits were Monday and Wednesday and they would always land on a holiday, and they never gave me none of the visits that I missed during COVID."

¶ 21      The trial court stated to K.O., in closing, that "no one in this courtroom has ever said anything to me that you don't love those children."

¶ 22      On February 22, 2024 the termination trial resumed with closing arguments. K.O. interrupted the arguments once and the trial court warned K.O. that if she interrupted again she would be removed from the courtroom. There were no further interruptions. K.O. voluntarily left

the courtroom for approximately five minutes for what was believed to be a bathroom break.

After closing arguments, the trial court noted for the parents that parental rights could be

terminated "if even a single, just one ground of unfitness is supported by clear and convincing

evidence." The court addressed K.O. directly, stating:

"THE COURT: [K.O., your attorney] was kind enough to comment that

this Court is respectful to litigants. I try to treat people like I want to be treated.

And so that is why I always address you, I may sometimes refer to you as Mom,

but I have to remember the appropriate name when I address you.

But I guess I'm very dishearten [*sic*] because not once, but twice you have

come into my courtroom in person and have been disrespectful of the process.

And I appreciate that you have been present, I looked at every exhibit that they

sent to me.

And I submit to you, I don't believe that you don't love your children, but

you have got some anger that's is [*sic*] built up and that is how you were directing

it at me."

¶ 23    K.O. asked to say something to the trial court and the court allowed K.O. "an opportunity

to make a record." K.O. stated that L.B. never received therapy for a sexual assault she suffered

and expressed her belief L.B. would be better off with her father. K.O. stated, "the prior Judge

that terminated the rights from other children, are currently focusing on that, but I'm already

going to appeal it because I have the evidence." The trial court stopped K.O. and stated the court

would read its order. The court stated, in part, as follows:

"THE COURT: This court finds by clear and convincing evidence, that the

minors have received notice, and they are represented by an attorney, the

- 10 -

Guardian Ad Litem [(GAL)]. They were found abused, neglected or dependent on

May 17th of 2018. They were adjudged wards of the court on July 13, 2018.

[K.O.] has appeared. She is represented by counsel.

This Court finds by clear and convincing evidence, that she is unfit

pursuant to 705 ILCS 405/2-29 and 750 ILCS 50/1(b) on specific grounds b as in

Boy and m as in Mary."

¶ 24    The trial court asked the State if it was ready to proceed to the best interest portion of the

trial. The State was ready to proceed as to E.O. but there was a motion to continue the case as to

L.B. because "there is concern about placement." The State informed the court that it was

expected that L.B. would be in a pre-adoptive home in the beginning of April 2024. The GAL

informed the court she would continue to work in L.B.'s best interest to find an appropriate

placement including the possibility of placement with a member of her father's family. The court

continued the best interest trial for L.B. to May 23, 2024 and the parties proceeded with the best

interest trial for E.O.

¶ 25    Before the State began its examination of its first witness the assistant state's attorney

informed the court "I saw the mother pull out her phone and do something, right before." After a

brief exchange and a discussion off the record, the trial court stated, "So I want to remind you

that it is a felony to record anyone without their permission." K.O. said the court could check her

phone. The court warned K.O. she would be removed from the courtroom and stated, "And as I

have told you, not once not twice, but about four times we will see you outside so my record is

clear." Then the following exchange occurred:

"[K.O.]: So you going to let a lady testify. I don't know what you so

scared. I can find out where you live why you so scared is because you lied that's

why bitch.

THE COURT: I am going to have the Sherriff escort you out. The record

is going to reflect that the Sherriff has escorted [K.O.] out as she is being

disruptive to the Court proceedings."

The assistant state's attorney informed the court that K.O. threatened her as K.O. was being

escorted out.

¶ 26    E.O.'s foster parent and Najara testified about E.O.'s foster home placement. The foster

parent wished to adopt E.O. E.O. was placed in the foster home when he was four-years old but

left because of a behavior issue. At the time of trial he had been back in the home for

approximately one year. E.O. and the foster parent had discussed the prior issue by telephone.

Najara testified the home is safe and appropriate, and E.O. is making progress. Najara testified

that E.O. is attached to his foster parent and he told Najara that he wanted to be adopted by his

foster parent. Following arguments, the trial court orally ruled as follows:

"THE COURT: As to the mother, it is in the best interest of the minor to

terminate the mother's parental rights. The Court orders as to the mother they are

terminated, I'm sorry, the parental rights of the mother are involuntarily

terminated, based upon the above findings of unfitness and the best interest of the

minor.

This Court finds that the State has met its burden by a preponderance of

the evidence, and also based upon the enumerated best interest factors."

¶ 27    On May 23, 2024 the termination trial resumed with the best interest trial as to L.B.

Before proceedings began, the State confirmed that K.O. was not present and was not outside the

courtroom. A supervisor from the agency servicing the family, Zandra Washington, and a

caseworker from the agency, Michelle Howard, testified at the best interest portion of the trial as

to L.B. Washington testified that L.B. left her residential placement in April 2024 and was in

specialized foster care. The agency could not find a placement with a relative. L.B. told

Washington that L.B. wanted to come to court to tell K.O. that L.B. did not want contact with

K.O. and wanted to be adopted by her foster parent. Washington testified that L.B. has not been

interested in visiting with K.O. since the last court date in February 2024. L.B. is very happy in

her current placement. Howard testified the foster home was safe and appropriate for L.B.

Howard also testified that L.B. said that she wanted to be adopted by her foster mother. The

foster mother also testified. L.B. had been placed in her home the previous month. L.B. and the

foster mother's daughter get along very good. L.B. calls her "mom." The foster mother testified

that she would like to adopt L.B.

¶ 28    Following arguments, the trial court found that the State met its burden. The court stated,

"the parental rights of the mother, [K.O.,] are involuntarily terminated based upon the findings of

unfitness and the best [interest] of the minor." The court noted that K.O. was not in court and

said that "when I give [the father] his findings and appellate rights, they shall stand as if [K.O.] is

present in court." The court concluded, "The Court further finds the best interest of the minor

requires appointment of a guardian with the right to consent to adoption." The court entered a

goal of adoption "now that the parental rights have been terminated."

¶ 29    K.O. filed separate notices of appeal of the judgments as to L.B. and E.O. On June 20,

2024, the Office of the Public Guardian filed a motion to consolidate the appeals. On June 21,

1-24-0532)
1-24-1152) Cons.

2024, this court granted the motion and consolidated the appeals of the judgments terminating

K.O.'s parental rights as to L.B. (case no. 1-24-1152) and E.O. (case no. 1-24-0532).

¶ 30    This appeal followed.

¶ 31                                    ANALYSIS

¶ 32    This is an appeal from a judgment terminating parental rights.

"The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2020))

sets forth a two-step process to involuntarily terminate a parent's rights.

[Citation.] First, the State must prove, by clear and convincing evidence, that a

parent is 'unfit' as defined by one of the grounds in section 1(D) of the Adoption

Act. 705 ILCS 405/2-29(2) (West 2020); 750 ILCS 50/1(D) (West 2020). If the

court finds a parent unfit, it must determine whether it is in the child's best

interest to terminate that parent's rights. 705 ILCS 405/2-29(2) (West 2020).

                                       * * *

A finding of unfitness will not be reversed unless it is against the manifest

weight of the evidence." *Interest of Y.F.*, 2023 IL App (1st) 221216, ¶¶ 28-30.

"We will not reverse the trial court's best interest finding unless it is against the manifest weight

of the evidence or the court abused its discretion." *In re M.R.*, 2020 IL App (1st) 191716, ¶ 27.

"A decision is against the manifest weight only when the opposite conclusion is clearly evident

([citation]) or where the finding is unreasonable, arbitrary, or not based on the evidence."

*Interest of Y.F.*, 2023 IL App (1st) 221216, ¶¶ 28-30. "A trial court abuses its discretion if the

trial court acts arbitrarily without conscientious judgment, exceeds the bounds of reason, or

ignores recognized principles of law, so that substantial prejudice results." *In re G.L.*, 329 Ill.

App. 3d 18, 25 (2002).

¶ 33     However, K.O. challenges neither the determination that she is unfit nor that termination of her parental rights is in the children's best interests. K.O. argues the trial court erred by beginning the fitness portion of the termination trial in her absence. K.O. was subpoenaed to appear at 9:30 a.m. at her own request. We agree with K.O. that the trial court accepted her assertion that she was present outside the courtroom at 9:00 a.m. K.O. argues that the trial court denied her right to due process and a fair trial by beginning the hearing in her absence "at only 9:34 a.m." without waiting briefly "to have someone check the hallway or make inquiries, to ask counsel to call her, and begin the hearing only after ascertaining the status of whether [K.O.] was en route or even present in the courthouse." This would have been the "better practice" and was done at the best interests hearing where the parties made a record of checking for K.O.'s presence and confirming that she was not in the courthouse.

¶ 34     K.O. argues that as a result of the trial court's conduct, she "missed very important testimony, much of it adverse to her and which, had she heard it, she might well have wished to clarify or comment on in her own testimony." K.O. also argues that her right to be present at the proceeding and her fundamental liberty interest in the care of her children outweigh the costs of a brief delay in the proceedings. K.O. cites *In re J.P.*, 316 Ill. App. 3d 652 (2000), in support of the need to balance the government's interests with the parent's interest to determine whether due process requires the court to continue the proceedings. In *In re J.P.*, the appellate court determined that the trial court abused its discretion when it did not continue a fitness hearing where the parent was absent from the hearing, the record did not show that the parent was given proper notice, and, unlike other cases cited by the court, the parent did not have an attorney present. *Id*. at 661-62.

¶ 35    Here, K.O. did have notice and did have an attorney representing her at the hearing. Moreover, K.O.'s attorney did not object to commencing the proceeding in K.O.'s absence and did not raise the issue in a posttrial motion. "To preserve an issue for appellate review, a party must, even in child custody cases, object at trial and file a written posttrial motion addressing it." *Matter of Chance H.*, 2019 IL App (1st) 180053, ¶ 45. Therefore, this issue is forfeited for review. K.O. asks this court to review the trial court's decision as plain error. This court has recognized that:

> "Just like it is possible to forfeit a claim, it is possible to forfeit a plain-error argument when a litigant fails to explain how either of the two prongs of the plain-error doctrine is satisfied. [Citation.] While forfeiture is a bar on the parties, and not a limitation on the courts, this 'oft-cited proposition does not abrogate standard waiver and forfeiture principals [*sic*] and 'should not be a catchall that confers upon reviewing courts unfettered authority to consider forfeited issues at will.' [Citations.]" *In re H.C.*, 2023 IL App (1st) 220881, ¶ 82.

¶ 36    "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the [party,] regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the *** trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). In *In re H.C.*, this court found that, "[b]ecause appellant-mother has supplied us with no argument or analysis, even a cursory one, as to which prong of the plain-error doctrine would permit review of these claims, we deem them forfeited and need not address whether the trial court erred ***." *In re H.C.*, 2023 IL App (1st)

220881, ¶ 83. In this case, K.O.'s only argument concerning plain error is, in its entirety: "And in view of the fundamental liberty interest involved, courts have reviewed unpreserved errors in parental-rights cases as plain error. [Citations.]"

¶ 37     Here, as in *H.C.*, K.O. "has supplied us with no argument or analysis, even a cursory one, as to which prong of the plain-error doctrine would permit review of these claims." Therefore, we deem K.O.'s claim the trial court denied her right to due process forfeited for plain error analysis. Nonetheless, K.O. argues that the rule of waiver is a limitation on the parties and not the court, and "the Court's 'concern for reaching a just result may override considerations of waiver.' " In *In re Madison H.*, on which K.O. relies, our supreme court found, under the circumstances of that case, "where the well-being of a child and parental rights are at issue," the court would "elect not to apply the rule of waiver and will consider the case on the merits." *In re Madison H.*, 215 Ill. 2d 364, 371 (2005). Although we agree with the *H.C.* court that this court's authority to forgive forfeiture of an issue is not a "catch all" excuse that confers jurisdiction, we will address K.O.'s claim on the merits.

¶ 38     On the question of whether the trial court abused its discretion or violated K.O.'s right to due process by starting the termination trial in her absence, we find no error occurred, and that K.O.'s rights were not violated. "[T]he minor's parents *** have the right to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses, to examine pertinent court files and records and also, although proceedings under this Act are not intended to be adversary in character, the right to be represented by counsel." 705 ILCS 405/1-5(1) (West 2020). However, as K.O. concedes, "[a]lthough a parent has a right to be present at a hearing to terminate parental rights, presence is not mandatory, and the trial court is not obligated to delay the proceedings until the parent chooses to appear." *In re J.P.*, 316 Ill. App. 3d at 661. See also

*In re Es. C.*, 2021 IL App (1st) 210197, ¶ 18 (finding that the right to be present under the 705 ILCS 405/1-5 Act (705 ILCS 405/1-5(1) (West 2020)), "in-person or otherwise, is not absolute").

¶ 39      Furthermore, as stated above, K.O. does not argue that the manifest weight of the evidence does not support the trial court's finding that K.O. is unfit. Nor does K.O. argue that the manifest weight of the evidence does not support the finding that it is in the children's best interest to terminate her parental rights or that the trial court otherwise abused its discretion in doing so. *In re G.L.*, 329 Ill. App. 3d 18, 25 (2002) ("a trial court's decision that termination of parental rights is in a child's best interests will be reversed if the trial court's findings were contrary to the manifest weight of the evidence or if the trial court otherwise abused its discretion"). The substantive propriety of the trial court's judgment is forfeited for review, as is any argument K.O.'s temporary absence from the proceedings negatively impacted the trial court's' judgment. *In re Madison H.*, 215 Ill. 2d at 379 ("it is abundantly clear that she did not argue the sufficiency of the evidence on appeal. Respondent's appeal was limited to the statutory writing requirement contained in section 2–27(1). Thus, by not objecting during the proceedings or raising the issue in a posttrial motion, or even on appeal to the appellate court, the respondent has forfeited this issue for purposes of our review."). Therefore, the trial court did not err by starting the proceedings when K.O. was not personally present in court but was represented by counsel.

¶ 40      As to K.O.'s due process rights, the court has observed:

"The due process clause of the United States Constitution provides heightened protection against government interference with parents' fundamental rights, including their right to make decisions concerning the care, custody, and

control of their children. [Citation.] In limited instances, however, State interference with fundamental parental rights is justified to protect the health, safety, and welfare of children. [Citation.] 'Due process in the context of interference with parental rights is achieved by compliance with the provisions of the Juvenile Court Act [of 1987] and fundamental fairness.' [Citation.] We review *de novo* claims concerning due process violations.

\* \* \*

When determining what due process requires in proceedings that implicate a fundamental liberty interest, three factors must be considered: (1) the private interest implicated by the official action; (2) the risk of erroneous deprivation of that interest through the procedures used, and the probable value, if any, of additional or substitute safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute safeguards would entail." *In re M.B.*, 2019 IL App (2d) 181008, ¶¶ 15, 20.

¶ 41    We acknowledge that "[a]s to the first factor, the private interest at stake is [K.O.'s] fundamental interest in the control, custody, and care of [her] children." *Id*. ¶ 21.

¶ 42    As to the second factor, there is "only a minimal risk that the [trial court's conduct] erroneously deprived [K.O.] of [her] fundamental interest." *Id*. ¶ 22. In this appeal, K.O asserts she may have wanted to refute some of the testimony she missed. K.O.'s attorney was present for the testimony K.O. missed, K.O. did testify, and K.O.'s attorney could have questioned K.O. on any of the evidence K.O. missed. In light of counsel's presence, we also find very little probable value, if any, to the additional safeguard of checking for K.O. presence. Here, unlike in *In re*

*M.B.*, K.O. was represented by counsel at the termination trial; the evidence against K.O. was subject to cross-examination by K.O.'s counsel; and the trial court was presented with "both sides." Compare *In re M.B.*, 2019 IL App (2d) 181008, ¶¶ 22-23.

¶ 43    As to the third factor, we find that the trial court properly balanced the State's interest in a prompt disposition of custody issues with K.O.'s right to be present. "In a termination proceeding, delay imposes a serious cost on the function of government, as well as intangible costs to the lives of the children involved." *In re J.P.*, 316 Ill. App. 3d at 661. It is appropriate to balance the State's interest and the parents' right to be present to determine what due process requires. *In re J.P.*, 316 Ill. App. 3d at 661 ("when balancing a parent's interests and right to due process against the interests favoring a prompt disposition, a trial court must cautiously observe the relevant procedural requirements"). This court has found that where the burden of delay caused by a parent's absence is the concern, a "reasonable alternative" is to proceed with the parent's counsel present. See *In re M.B.*, 2019 IL App (2d) 181008, ¶ 30 ("the court could have found that respondent forfeited only his statutory right to be present and it could have proceeded, with counsel, in his absence"). See also *In re J.P.*, 316 Ill. App. 3d at 661 (citing *In re C.L.T.*, 302 Ill. App. 3d 770, 779 (1999)). In *In re J.P.*, the court found that the trial court abused its discretion in conducting a best interests hearing in the mother's absence finding it important that the mother's "interests were *not* represented by counsel at the hearing." (Emphasis added.) *In re J.P.*, 316 Ill. App. 3d at 662. In *In re C.L.T.*, the court held that "since [the mother] *was* represented by counsel at the hearing, her right to due process was not denied when the hearing proceeded in her absence." (Emphasis added.) *In re C.L.T.*, 302 Ill. App. 3d at 779.

¶ 44   We also note that K.O. has made no complaints about her attorney's representation. We find that the trial court did not violate K.O.'s right to due process when it started the termination trial in her absence where K.O.'s interests were represented by counsel.

¶ 45   Next, K.O. asks this court to order "a limited remand for the [trial] court to set forth findings of fact in support of its rulings (unfitness and best interests)." The trial court did not make oral or written findings of fact in support of its unfitness or best interest judgments. K.O. argues that such findings are necessary to facilitate appellate review and to enable parents "who have participated in services, perhaps after being told at some point that that is what is needed to get their children back, and who perhaps felt that matters had been proceeding well, to understand why that was not sufficient, enhancing trust in the judicial process."

¶ 46   The Public Guardian joined by the State argue:

   "[T]here is no requirement for trial courts to provide factual findings for either portion of their termination rulings, and the lack of factual findings here does not preclude review of the manifest weight of the evidence. Moreover, [K.O.] is not challenging the evidence. Remanding the case for the limited purpose of the trial court clarifying its ruling would serve no purpose, except to delay the resolution of these children's cases, which began more than seven years ago, in 2017."

¶ 47   In support of her argument, K.O. cites *In re B'Yata I.*, 2013 IL App (2d) 130558. The issue in that case was "whether the trial court's failure to set forth a factual basis prevents this court from conducting a meaningful review of the unfitness finding in this case." *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 34. As the Public Guardian and State note, review of either the unfitness findings or the best interest findings is not a concern in this case because K.O. has

- 21 -

forfeited both for review. *People v. Shaw*, 2019 IL App (1st) 152994, ¶ 25 (quoting Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016) (" 'Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.' ")), *People v. Robinson*, 2021 IL App (1st) 192289, ¶ 35 ("Issues that were not raised in the first appeal are considered forfeited"). Therefore, *In re B'Yata I.* and cases remanding for the trial court to make factual findings to facilitate review of the trial court's unfitness or best interest judgment are inapposite.

¶ 48     Still, specific findings of fact are preferable in termination proceedings, even though the lack of such findings does not require reversal in every case. See *In re Richard H.*, 376 Ill. App. 3d 162, 166 (2007), *In re Jaron Z.*, 348 Ill. App. 3d 239, 263 (2004) ("a trial court need not articulate any specific rationale for its [best interest] decision"). When our supreme court held that oral findings of fact were sufficient to satisfy the writing requirement of section 2-27(1) of the Juvenile Court Act (705 ILCS 405/2-27(1) (West 2002)), the court found that oral findings, "to the extent that they are explicit and advise the parties of the basis for the court's decision, satisfy the purpose of the writing requirement, which is *to 'give the parties notice of the reasons forming the basis for the removal of the child* and to preserve this reasoning for appellate review.' " (Emphasis added.) *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 31 (quoting *In re Madison H.,* 215 Ill. 2d at 374-77). Our supreme court found that the evidence presented during the proceedings is not enough to "know what facts in particular the [trial] court relied upon in making its fining. *In re Madison H.*, 215 Ill. 2d at 377-78 ("The testimony presented at the dispositional hearing on March 7, 2003, and the reports considered by the court clearly indicate that respondent's developmental disability prompted the trial court's finding. However, a review of the trial court's oral statement on the record makes no mention of respondent's developmental disability and we cannot know what facts in particular the court relied upon in making its

finding."). In *Madison H.*, our supreme court found that the oral findings in that case were "neither explicit nor fact-specific to respondent." *In re Madison H.*, 215 Ill. 2d at 379.

¶ 49    *In re Madison H.* suggests that in this context a trial court should provide a "meaningful specific factual basis" for the trial court's findings and that, where that factual basis is not evident from the record of the trial court's judgment—not just the evidence presented—the order fails to provide "fair notice of the reasons for its decisions." *In re Madison H.*, 215 Ill. 2d at 378. We are thus sympathetic to K.O.'s concern that parents understand why their efforts to have their children returned to them failed. Nonetheless, the appellant still has the burden to establish their right to relief on appeal. *Insurance Benefit Group, Inc. v. Guarantee Trust Life Insurance Co.*, 2017 IL App (1st) 162808, ¶ 44 ("the appellant, bears the burden of persuasion as to its claims of error"). In this case, K.O.'s passing claim about factual findings being necessary to ensure "trust in the judicial process" is not supported by any argument establishing her right to relief. K.O.'s brief only makes general assertions about all parents subject to termination proceedings. There is no specific claim of confusion or that the reasons for the trial court's decisions *in this case* are unclear. Claims that are not supported by relevant argument are forfeited for review. "Both argument and citation to relevant authority are required. An issue that is merely listed or included in a vague allegation of error is not 'argued' and will not satisfy the requirements of *** [Illinois Supreme Court Rule 341(h)]". *Vancura v. Katris*, 238 Ill. 2d 352, 370 (2010). K.O. forfeited any claim that additional factual findings are needed to facilitate appellate review. To the extent K.O. implies remand for additional factual findings is needed because she cannot glean the reasons for the trial court's judgment, K.O. has failed to establish a right to relief and the issue is forfeited.

¶ 50    Regardless, we find that the primary focus of this claim on appeal is K.O.'s argument that factual findings are necessary to ensure the trial court's judgment is not against the manifest

weight of the evidence or an abuse of discretion. K.O. argues that a detailed factual basis is needed to "be sure that the [trial] court did not rely in part on a misunderstanding of some aspect of the evidence" and that a "recitation of the facts relied upon would ensure that the court accounted for all relevant factors." As stated above, K.O. does not challenge the trial court's decision. Moreover, "a reviewing court need not rely on any basis used by the trial court below in affirming its decision" on best interests (*In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19) which is the paramount concern in the decision to terminate parental rights (*In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 18 ("it is not even necessary for a court to first find the minor's parents unfit or that they forfeited their custodial rights if a best interest determination shows that the minor should be placed with someone other than her parents"). In this case, among other concerns, both minors testified unequivocally that they wanted to be adopted by their foster parents. Even if the issue of whether the trial court's judgment is against the manifest weight of the evidence or an abuse of discretion was not forfeited, we find that all of the evidence is ample to support the trial court's judgment and that no abuse of discretion occurred.

¶ 51                                   CONCLUSION

¶ 52     For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 53     Affirmed.

- 24 -